UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| DARSHAE BRUCK, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 21-152-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| JOSH PETRY, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

Plaintiff Darshae Bruck claims that Defendants Josh Petry, Jennifer Kermeen, and the Madison County Sheriff's Office's (the "MCSO") violated his constitutional rights during a "suicide call" encounter that ultimately resulted in Bruck's arrest. [Record No. 51, ¶¶ 16–42] Bruck also makes several related claims under federal and state law. [*Id.*, ¶¶ 43–63] The matter is now ripe for consideration of Petry, Kermeen, and the MCSO's motion for summary judgment. [Record No. 66]

The defendants contend that they are entitled to summary judgment based on: (i) the reasonableness of their actions on the day in question; (ii) the doctrines of qualified and sovereign immunity; (iii) Bruck's failure to plead certain required facts; and (iv) the fact that one of Bruck's claims is merely a "gap-filler."  They also argue that the facts pleaded do not otherwise support Bruck's allegations. [*See generally* Record No. 66-1.]

After careful consideration and for the reasons outlined below, the defendants' motion for summary judgment will be granted, and Bruck's claims will be dismissed.

**I**

After leaving work in the early morning hours of June 29, 2020, Darshae Bruck posted a series of suicidal messages to his Snapchat account. [Record Nos. 66-5, 66-6, 66-7] A concerned friend saw these posts and called 911 at roughly 2:15 p.m. to report that she believed her "friend . . . [was] going to kill himself." [Record No. 66-8 (911 call recording)] Sergeant Josh Petry and Deputy Jennifer Kermeen were dispatched approximately eight minutes later to address the situation. [Record No. 66-9, p. 2 (MCSO call log)] Both officers had received training regarding interacting with individuals with mental health issues, including how to recognize the signs or behavior associated with a mental disorder, how to handle welfare checks, and how to help de-escalate those in "the midst of a mental health crisis." [Record No. 63, p. 13, 111; Record No. 64, p. 27–28]

Petry and Kermeen arrived at Bruck's residence at roughly 2:34 p.m. and made contact with Bruck's sister Daneisha at the front door. [Record No. 60, p. 11] The officers asked for Bruck, but Daneisha went to get their mother Laurie, because "[Bruck] does have bipolar and is not the calmest." [*Id.*, p. 9] When Laurie came to the door, the officers advised her that they were there because of Bruck's social media posts. [Record No. 61, p. 15] Laurie told the officers that she was aware of the posts, but that Bruck was fine and currently sleeping. [*Id.*, p. 15, 26] Nonetheless, the officers advised Laurie that they needed to see Bruck and asked her to wake him. [*Id.*] Laurie agreed while Bruck's father, Robert Palmer, spoke with the officers. [*Id.*, p. 26–27]

Bruck came to the door but attempted to remain inside and speak to the officers through the screen door. However, the officers insisted that he step outside. [Record No. 15-1, ¶¶ 7–

9] Petry asked Bruck if he had made the social media posts, which Bruck confirmed. [Record No. 59, p. 34] Petry then asked if he "still had feelings of harming [himself]." [*Id.*] Bruck responded "Yes, I did . . ." and was attempting to explain further when Petry cut him off and told him that he needed to go to Eastern State Hospital.[1] [Record No. 15-1, ¶¶ 12–14] Bruck protested that he did not need to go to Eastern State and attempted to go back inside. [Record No. 59, p. 35] Petry then grabbed Bruck's wrist to prevent him from reentering the home and reiterated more sternly that he needed to go to Eastern State. [*Id.*, p. 35–36] At this point, Bruck jerked his arm away from Petry and began walking away. [*Id.*]

Once Bruck had walked away, Petry allowed his father to go talk to him "to try to calm him down, to deescalate" the situation in light of Bruck's mental state. [*Id.*, p. 36, 40; Record No. 63, p. 109–10] This proceeded for about 30 seconds to no avail before Petry came over and grabbed Bruck's wrist again to escort him to his cruiser and transport him to Eastern State. [Record No. 59, p. 36, 40–41] But Bruck pulled loose and began to walk away. [*Id.*, p. 36]

After Bruck had taken about ten steps Petry suddenly grabbed him around his lower ribs and tackled him to the ground. [*Id.*, p. 36, 43] Bruck and Petry began struggling with one

---

[1]    There is some discrepancy between this version of Bruck's response (derived from his initial affidavit) and the account from his later deposition testimony. In his deposition, Bruck claims in his deposition that he said "no; I did last night, but now I'm good," before Petry cut him off. [Record No. 59, p. 34] The Court includes the affidavit version above because it aligns more closely with the version of events relayed by the others present, including Bruck's parents. [Record No. 61, p. 28 ("And he's like, well, do you still feel low? *And my son said, yes, but* -- and as soon as he said the but, the officer grabbed his arm and said, well, you need to go to the hospital.") (emphasis added); Record No. 17-1, p. 1 ("They asked him if he was a threat to himself or anyone else and *he said at the time yes* but the officer cut him off.") (emphasis added)] This discrepancy is not material and does not affect the Court's analysis.

another on the ground, with Bruck "trying to get onto [his] knees . . . to fight [Petry]." [*Id.*, p. 44] Around this time, Bruck's sisters began capturing video of the encounter. [*Id.*, p. 36]

The footage begins with Bruck in a kneeling position with both hands on the ground. [Record No. 66-11, 00:00-00:02; Record No. 66-12, 00:00-00:20] Petry is kneeling behind Bruck with his left hand on Bruck's left wrist while Kermeen is kneeling to Bruck's right attempting to apply a handcuff. [Record No. 66-11, 00:00-00:02; Record No. 64, p. 84–86] At roughly 2:42 p.m., Petry uses his lapel microphone to call for additional units. [Record No. 66-9, p. 1] At this point, Petry's right arm is under Bruck's chin with his elbow aiming down and his hand grabbing Bruck's left shoulder. [Record No. 66-11, 00:03-00:05; Record No. 66-12, 00:00-00:03] Petry then attempts to gain control of Bruck's left arm by moving his left hand on top of Bruck's left hand. [Record No. 66-11, 00:15-00:17; Record No. 66-12, 00:04-00:17; Record No. 63, p. 44–45] Bruck continues to struggle with the officers throughout this time, screaming "I don't wanna go" and "get off" several times. [Record No. 66-11, 00:05-00:17; Record No. 66-12, 00:00-00:20]

Shortly after the struggle commences, Bruck bites Petry's arm, drawing blood. [Record No. 59, p. 37] The video depicts Petry jerking his arm back in surprise, and he can be heard saying "don't bite me, man; don't bite me." [Record No. 66-12, 00:21-00:26] Petry then tries to gain compliance using a mandibular angle pressure technique, but Bruck was able to move his head away from the pressure. [Record No. 63, p. 45–47; Record No. 66-12, 00:23-00:25]

At this point, Petry begins to apply a neck restraint.[2]  [Record No. 63, p. 48; Record No. 66-12, 00:24-00:26]

Petry maneuvers his left arm under Bruck's chin to apply the restraint.  [Record No. 66-12, 00:24-00:26]  He then grabs his left hand with his right in front of Bruck's right shoulder and forces Bruck to the ground.  [Id.]  During this time, Kermeen is occupied by her focus on Bruck's right hand.  [Id.]  For a brief moment before the group hits the ground, Petry's forearm appears directly in front of Bruck's throat.  [Id., 00:26-00:28]  Once on the ground, however, Bruck turns his face towards the left, with his chin pointing towards the crook of Petry's elbow.  [Id., 00:28-00:30]  It remains facing that direction until Petry pulls his left arm out and attempts to remove Bruck's left arm from underneath his body.  [Id., 00:30-00:43]

Petry then moves himself to straddle Bruck's hips and continues trying to pull Bruck's left arm from under his body.  [Record No. 66-11, 00:17-00:22]  Kermeen's attention, meanwhile, remains focused on Bruck's right wrist to prevent him from using the attached handcuff as a weapon against the officers.  [Id.; Record No. 64, p. 88–89]  Bruck screams and attempts to raise himself off the ground, bringing himself into a kneeling position.  [Record No. 66-11, 00:41-00:46]  This causes Petry to reapply the neck restraint.  Petry crosses his right arm under Bruck's chin until Bruck's chin is in the crook of his elbow, then pulls his left arm out from under Bruck's left armpit and uses his left hand to hold his right wrist.  [Id., 00:43-00:49; Record No. 66-14, 00:00-00:02]  Bruck then pulls his left arm away from

---

[2]     The parties dispute whether the neck restraint utilized was a "chokehold," as asserted by Bruck, or a "lateral vascular neck restraint," as claimed by the defendants.  [See Record No. 66-1; Record No. 72-1.]  The Court will address this dispute in its analysis of Bruck's excessive force claim but refers to the restraint generally for the time being.

Kermeen trying to apply the other handcuff, shifting his body to the left. [Record No. 66-11, 00:48-00:50; Record No. 66-14, 00:02-00:03] When Bruck places his left hand on the ground, Petry releases his own left hand from the restraint hold and grabs at Bruck's hand while keeping his right elbow under Bruck's chin. [Record No. 66-11, 00:51-00:53; Record No. 66-14, 00:03-00:05] Once Petry has Bruck's left hand, they turn parallel to the sidewalk and go to ground, with Bruck's head turning to the right to stay in line with Petry's right elbow. [Record No. 66-11, 00:53-00:56; Record No. 66-14, 00:05-00:10] Witnesses can be heard insisting that the officers are choking Bruck, but Petry responds that "if he's talking, he can breathe." [Record No. 66-11, 00:57-01:01; Record No. 66-14, 00:10-00:20; *see also* Record No. 64, p. 91–92 (Kermeen stating that she did not believe Bruck couldn't breathe because "he was still yelling and screaming and still pushing his weight up against us in an attempt to stand.").]

Kermeen, still holding Bruck's right wrist, moves up to around his waist while Petry rolls to his left side and removes Bruck's left arm from underneath him. [Record No. 66-11, 00:53-01:03; Record No. 66-14, 00:08-00:30] Petry and Kermeen are then finally able to secure Bruck in handcuffs. [Record No. 66-11, 01:02-01:10; Record No. 66-14 00:20-00:40] At approximately 2:44 p.m., Petry calls for emergency medical services, and roughly one minute later notifies dispatch that Bruck has been detained. [Record No. 66-14, 00:50-00:59; Record No. 66-9, p. 1] Kermeen attempts to explain the situation to Laurie Bruck while Petry pats Bruck on the back and encourages him to calm down and take deep breaths. [Record No. 66-16, 00:00-00:17] The footage ends shortly thereafter.

Once other officers arrive on the scene, Petry removes himself from the area "to limit any future escalation" and is directed to obtain treatment for his bite wound.  [Record No. 66-13, p. 5; Record No. 66-17, p. 4]  The ambulance arrives on scene at roughly 2:52 p.m.  [Record No. 66-15, p. 2]  Kermeen walks Bruck to the ambulance, but he remained combative and resistant.  And once in the ambulance, Bruck began punching and kicking and screaming at the paramedics and was restrained with straps to allow further examination.  [Record No. 59, p. 58, 62–63]  However, once Bruck was calm enough to be examined, neither the paramedics nor he believed that he had any injuries requiring treatment.  Specifically, the paramedics did not observe any injuries to Bruck's neck or throat, or note that he was having any trouble breathing.  [*Id.*, p. 63–65; Record No. 66-19, 04:41-04:45, 05:03-05:28, 09:41-11:18; Record No. 66-20, 07:11-08:18]

Following these events, Bruck was charged with third degree assault stemming from his bite of Petry's arm, as well as resisting arrest.  [Record No. 66-22]  Once he was cleared by medical personnel, he was transported to the Madison County Detention Center and released later that evening.  [Record No. 66-17, p. 4; Record No. 59, p. 68]  The charges were later dismissed after Bruck stipulated that there was probable cause for his arrest.  [Record No. 59, p. 16–19]

The MCSO initiated an investigation of Petry and Kermeen's actions during the encounter, but ultimately found no wrongdoing.  [*See generally* Record No. 66-17.]  Upon reviewing the relevant materials, the Office of the Kentucky Attorney General also found that "no officer with the Madison County Sheriff's Office was in violation of Kentucky law during the encounter with Mr. Bruck."  [Record No. 66-24, p. 1]

Bruck filed this action against the MCSO, Petry, and Kermeen on May 28, 2021. [Record No. 1]  In his Amended Complaint, he asserts the following Fourth Amendment claims under 42 U.S.C. § 1983: (i) excessive force against Petry and Kermeen; (ii) failure to intervene against Kermeen; and (iii) failure to train and failure to supervise against the MCSO. [Record No. 51, p. 6–7]  He also makes a claim against the MCSO for violating Title II of the Americans with Disabilities Act.  [*Id.*, p. 7–8]  Finally, Bruck brings several claims under Kentucky law, including: (i) battery against Petry and Kermeen; (ii) negligent infliction of emotional distress against all defendants; and (iii) negligent hiring, training, retention, and supervision against the MCSO.  [*Id.*, p. 8–10]

## II.

Summary judgment is appropriate if there are no genuine disputes regarding any material facts and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A material fact is one that "affect[s] the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a material fact is "genuine" if a reasonable jury could return a verdict for the nonmoving party.  *Id.* at 247-48.

The moving party bears the initial burden to demonstrate that it is entitled to judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 317.  This burden is met by showing that there is an absence of evidence on an issue which the nonmoving party has the ultimate burden of proof.  *Id.* at 325.  Once the moving party satisfies its burden, the nonmoving party must come forward with "specific facts" indicating there is a genuine issue for trial.  *Id.* at 324; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999).  In deciding whether to grant summary

judgment, the Court views all the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, where the events in question are captured on video, the Court need not adopt a version of the facts that is contradicted by the video and should instead "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

### III.

#### A.      Fourth Amendment Claims Against Petry and Kermeen

In Count I, Bruck asserts claims under 42 U.S.C. § 1983 against Petry and Kermeen, alleging that they violated his Fourth Amendment right to be free from the use of excessive force. [Record No. 51, ¶¶ 39–40] He further alleges that Kermeen violated her affirmative duty to intervene on his behalf by failing to halt Petry's use of the excessive force. [*Id.*, ¶ 41] Petry and Kermeen argue that that their actions did not violate Bruck's constitutional rights, and that they are protected by qualified immunity. [Record No. 66-1, p. 19–29]

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Thus, the doctrine requires a two-part inquiry. First, the Court determines whether the facts "show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, the Court examines "whether the right was clearly established" at the time of the violation. *Id.* The official is immune from suit if the answer to either questions is no.

When the defense is raised, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity. *Baker v. City of Hamilton*, 471 F.3d 601, 605 (6th Cir. 2006). To satisfy the clearly established prong of the analysis, the plaintiff must "identify a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires." *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 993 (6th Cir. 2017) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). In the Sixth Circuit, courts look "principally to the decisions of the United States Supreme Court and [the Sixth Circuit itself] to determine whether the law was clearly established." *Lavado v. Keohane*, 992 F.2d 601, 606 (6th Cir. 1993).

### 1. Excessive Force Claims

Excessive force claims are evaluated under an objective reasonableness standard, considering the totality of the circumstances. *Graham v. Conner*, 490 U.S. 386, 394–97 (1989). The court balances "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interest at stake." *Id.* at 396 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). The Supreme Court has identified three factors influencing this analysis: (i) the severity of the crime at issue; (ii) whether the suspect posed an immediate threat to the officers' or others' safety; and (iii) whether the suspect actively resisted arrest or attempted to flee. *Id.*

The circumstances surrounding the allegedly excessive force must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . allow[ing] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 396–97.

- 10 -

This analysis is undertaken separately for each alleged instance of excessive force, focusing only on "the moments immediately preceding that use of force." *Rucinski v. Cnty. of Oakland*, 655 F. App'x 338, 342 (6th Cir. 2016) (citing *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007)).

Here, Bruck's Amended Complaint cites two instances of allegedly excessive force: (i) Petry's tackle or "takedown" of Bruck; and (ii) Petry's use of a neck restraint.  [Record No. 51, ¶¶ 25–26]  As an initial matter, Bruck has provided no evidence that Kermeen applied either use of force.  [*See* Record Nos. 59–61, 72.]  In fact, his own deposition testimony states that it was Petry alone who performed each action.  [Record No. 59, p. 42–48]  Accordingly, Kermeen is entitled to summary judgment on Bruck's excessive force claims.  Petry, arguing that he did not use excessive force or violate a clearly established right, believes he is entitled to judgment in his favor.

### a.  The Takedown

Petry's first alleged use of excessive force came when Bruck pulled away from Petry for the second time, following Bruck's brief conversation with his father.[3]  [Record No. 59, p. 41–43] Bruck took about ten steps before Petry grabbed him around his lower ribs and took him to the ground.  [*Id.*, p. 42–44]

---

[3]  Although there is video footage of the second incident of allegedly excessive force, the cameras were not recording the incident at the time of the takedown.  [*See* Record Nos. 66-11, 66-12 (cell phone videos beginning at some point after the takedown).]  As a result, the Court relies on deposition testimony and other evidence in evaluating this issue.

Whether such a takedown is constitutionally permissible depends on whether "there was some real form of resistance or danger." *Jennings v. Fuller*, 659 F. App'x 867, 870 (6th Cir. 2016) (citing *Hayden v. Green*, 640 F.3d 150, 154 (6th Cir. 2011)). In the Sixth Circuit, actions such as "physically struggling with, threatening, or disobeying officers" constitute "active resistance." *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (quoting *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012)). And where a suspect actively resists, "the police can use [up to] a taser . . . to subdue him." *Id.* at 642.

Here, viewing the facts in the light most favorable to Bruck, a reasonable jury could only find that his actions constituted active resistance. *See id.* at 641. The undisputed facts demonstrate that he disobeyed Petry's verbal commands, physically struggled with and pulled away from Petry, was verbally defiant and combative, and actively attempted to avoid being detained.[4] [Record No. 59, p. 35–36, 38–39, 41] Accordingly, Petry's use of the takedown was constitutionally permissible. *See Jennings*, 659 F. App'x at 870; *Rudlaff*, 791 F.3d at 642.

The objective reasonableness of Petry's use of force is further supported by an examination of the *Graham* factors. *See* 490 U.S. at 396. Although Bruck had not committed a crime, he did confirm to the officers that he had been feeling suicidal, meaning that he was at least a threat to his own safety. [Record No. 61, p. 28; Record No. 69, p. 10] Further, a reasonable officer in Petry's position could have perceived Bruck as a potential threat to the safety of others. Bruck was agitated and verbally defiant, moving unsecured about a scene

---

[4]     While Bruck is correct that "noncompliance alone does not indicate active resistance," the conduct here in issue exceeds noncompliance and provides the "something more" required to transform his actions into active resistance that is fatal to his claim. *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013).

involving multiple bystanders, homes, and vehicles.  [*See* Record No. 66-4, p. 4 (discussing those present at the scene).]  Finally, he actively resisted being detained by Petry, and Petry could have perceived Bruck walking away as the beginning of an attempt to flee.  *See Graham*, 490 U.S. at 396 (listing active resistance and/or attempts to flee as the third factor).  A reasonable jury could only conclude that Petry was constitutionally able to employ the takedown on Bruck.  *See id.*

But even if Petry violated Bruck's Fourth Amendment rights by using the takedown, he would still be entitled to qualified immunity.  *See Saucier*, 533 U.S. at 201.  Bruck failed to demonstrate that the right allegedly violated was "clearly established" at the time of the claimed violation.[5]  *Id.*  The cases cited by Bruck as clearly establishing the right are materially distinguishable and do not satisfy his burden.  *See McCaig v. Raber*, 515 F. App'x 551, 555 (finding use of takedown constitutionally excessive where plaintiff "made no aggressive gestures or statements, attempted to cooperate, offered no resistance, and stated that he would 'go easy.'"); *Baker*, 471 F.3d at 603–04, 607–09 (finding use of baton to strike plaintiffs in the head constitutionally excessive and right to be free of such strikes clearly established where plaintiffs had either surrendered or were in the process of doing so at the time); *Lawler v. City of Taylor*, 268 F. App'x 384, 386–87 (6th Cir. 2008) (tackling detainee to floor unconstitutional where detainee only objected to instructions and raised arm slightly in non-

---

[5]     Five months *after* the incident underlying Bruck's claim, another judge of this Court held that "the cases do not condemn as unconstitutional, beyond debate, an officer tackling or taking to the ground a suspect or detainee that resists."  *Boyer v. Shirley*, No. 6:18-CV-90-REW, 2020 U.S. Dist. LEXIS 215758, at *19–20 (E.D. Ky. Nov. 18, 2020) (slip copy) (concluding that officers did not violate clearly established law by taking to the ground a detainee who was uncooperative and resisting commands).

threatening manner); *Pershell v. Cook*, 430 F. App'x 410, 411, 415 (6th Cir. 2011) (leg sweep takedown unconstitutional where subject was not resisting and merely told officers to leave his house).

### b. The Neck Restraint

Petry's second alleged use of excessive force involves application of a neck restraint following the takedown. Bruck claims that the restraint was a chokehold, while Petry characterizes it as a lateral vascular neck restraint ("LVNR"). [Record No. 51, ¶ 26; Record No. 66-1, p. 8] Because the differences between these two restraints affect the Court's analysis, the Court begins with a brief description of each.

A chokehold is a respiratory neck restraint during which the officer's forearm applies force to the front of the neck and throat. This restraint "[u]ses pressure to compress the trachea, generating strangulation and a high degree of pain." [Record No. 66-17, p. 49] As such, it is categorized as deadly force and is permitted by the MCSO only in response to deadly force assaults by the subject. [*Id.* at p. 49, 64] Conversely, a LVNR is a vascular restraint. The officer's forearm and bicep apply pressure to the sides of the neck, impeding the flow of blood to the subject's brain. [*Id.* at p. 50] The MCSO classifies this as a hard empty hand control and permits its use in response to "defensive resistance" by the subject.[6] [*Id.* at p. 50, 64]

Bruck's argument that Petry violated his constitutional rights in applying the neck restraint depends on: (i) his characterization of the restraint as a chokehold; and (ii) his

---

[6]     Defensive resistance is defined as "[p]hysical actions that attempt to prevent [the] officer's control, but [that] never attempt to harm the officer." [Record No. 66-25, p. 2] It is the equivalent to "active resistance" in the Sixth Circuit's parlance. *See Rudlaff*, 791 F.3d at 641.

contention that Petry used the restraint before Bruck resisted or displayed any aggression. [*See* Record No. 72-1, p. 18–19.]  However, the videos of the incident contradict these claims. [*See* Record Nos. 66-11, 66-12, 66-14, 66-16 (videos of the neck restraint incident).]

The videos demonstrate that Petry employed an LVNR rather than a chokehold. [*See id.*]  Attempting to manufacture a dispute over this fact, Bruck relies on a brief snippet from one of the videos as well as statements from lay witnesses. [Record No. 72, p. 3]  And while one video does show Petry's forearm in front of Bruck's throat for roughly two seconds, this is not uncommon where an officer is trying to properly position an LVNR on a moving subject. Moreover, the correct positioning was quickly established. [Record No. 66-12, 00:26-00:28 (showing Petry's forearm briefly in front of Bruck's neck); *id.* at 00:28-00:30 (positioning immediately corrected with Petry's forearm to side of Bruck's neck and Bruck's chin pointed towards the crook of Petry's elbow); *see also* Record No. 62, p. 37–41 (expert deposition explaining that during an active struggle the officer's forearm could appear briefly in front of the throat); Record No. 63, p. 51–53 (Petry explaining that his arm in front of the throat was not the final positioning for the technique but he was moving to apply the correct LVNR position).]  And the balance of the relevant video evidence depicts Petry employing the proper LVNR technique. [Record No. 66-11, 00:45-00:55; Record No. 66-14, 00:00-00:05]

The statements of lay witnesses describing the restraint as a chokehold are insufficient to disturb this conclusion. Indeed, "a lay witness's use of the phrase 'choke hold' to describe the action does no more than say that Plaintiff was held around the neck." *Turner v. Viviano*, No. 04-CV-70509-DT, 2005 U.S. Dist. LEXIS 35119, at *1 (E.D. Mich. July 15, 2005). Such statements do not demonstrate that an officer was using the police technique known as a

- 15 -

chokehold.  *Id.*  Where—as here—there is no evidence that the subject sustained injuries commonly associated with a chokehold (such as injury to the neck or loss of consciousness), lay witness testimony cannot create a jury question.  *Id.* at *10–11.

Based on the foregoing, Bruck must rely on his contention that the LVNR was excessive because it was utilized before he resisted or displayed any aggression.  [*See* Record No. 72-1, p. 18–19.]  But the video evidence belies this claim as well.  Petry did not use the LVNR until *after* Bruck bit him on the arm.[7]  [Record No. 66-12, 00:20-00:29]  Although the view of the bite itself is obstructed, the video shows Petry jerking his arm in surprise and saying, "don't bite me, man; don't bite me."  [*Id.*, 00:20-00:24]  Only then does Petry begin employing the restraint.  [*Id.*, 00:26-00:28 (showing the initial improper positioning before the correct position is established)]

Biting an officer goes beyond active resistance and crosses into outright aggression.  *Rudlaff*, 791 F.3d at 641.  And where a subject engages in active resistance, officers may use force up to and including intermediate weapons (such as a taser) to subdue the person.  *Id.* at 642.  Here, Petry utilized an LVNR, a hard empty hand control falling below the level of intermediate weapons.  [Record No. 66-17, p. 50, 64]  A reasonable jury could only conclude that Petry's use of this restraint in response to Bruck's resistance and aggression was objectively reasonable.

---

[7]    Although the video clips do not show the initial takedown or continuously depict the post-takedown struggle, no witnesses claim that a neck restraint was used during that time (i.e., during the moments preceding the bite that were not captured on video).  In fact, Bruck confirms that the entire neck restraint incident is captured on camera.  [*See* Record No. 59, p. 48–49, 53 (Bruck testifying that the video captures "just when he *starts* to put me in the headlock up until like he puts me – they try to put me in handcuffs.") (emphasis added).]

The *Graham* factors reinforce this conclusion. *See* 490 U.S. at 396. Bruck had at this point assaulted Petry by biting his arm. [Record No. 66-12, 00:21-00:26 (Lasikka Video 1 showing Petry's reaction to the bite); Record No. 59, p. 16–18 (discussing Bruck's stipulation to probable cause for his arrest on the assault)] Bruck remained a threat to his own safety, and now more clearly posed a threat to the safety of the officers and others at the scene. [Record No. 69, p. 10 (Bruck responding yes to Petry's question about whether he felt like hurting himself)] Finally, Bruck was already actively resisting, and the bite escalated that resistance into open aggression. *See Graham*, 490 U.S. at 396 (listing active resistance and/or attempts to flee as the third factor to consider). Petry's use of the LVNR in this scenario did not violate Bruck's constitutional rights.

But again, even if it did, qualified immunity would still shield Petry from liability. *See Saucier*, 533 U.S. at 201. Bruck has failed to show that the right he believes Petry violated was "clearly established" at the time of the alleged violation. *Id.* The cases he cites on this point are distinguishable and would not have given "'fair and clear warning to officers' about what the law requires" in this factual scenario. *Arrington-Bey*, 858 F.3d at 993 (quoting *White*, 137 S. Ct. at 552).

Unlike the detainees in the cases he cites, Bruck was not completely restrained or offering little to no resistance. Instead, he was actively resisting, and both officers were struggling to maintain some degree of control. *Cf. Coley v. Lucas*, 799 F.3d 530, 534–35, 541 (6th Cir. 2015) (finding use of chokehold constitutionally excessive where detainee was completely restrained and hold was applied until detainee lost consciousness); *Laury v. Rodriguez*, 659 F. App'x 837, 845–46 (6th Cir. 2016) (finding that it was unreasonable for

officer to exert pressure on detainee's neck where detainee was already restrained on the ground and was not struggling or resisting); *Valencia v. Wiggins*, 981 F.2d 1440, 1442 (5th Cir. 1993) (affirming denial of qualified immunity where the detainee merely asked a question before the officer repeatedly bashed his head against the cell bars and applied a chokehold that left the detainee unconscious). And unlike the officers in the cases cited, Petry did not resort to the neck restraint immediately, nor did he maintain the restraint once Bruck stopped resisting. *Cf. Griffith v. Coburn*, 473 F.3d 650, 652-53 (6th Cir. 2007) (reversing summary judgment in favor of officer where officer "all of a sudden" began choking the detainee after the detainee merely ignored officers and leaned back on the couch where he was sitting); *Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521, 532–33 (choking detainee for nearly a full minute, including after he ceased resisting, could constitute excessive force); *Degolia v. Kenton Cnty.*, 381 F. Supp. 3d 740, 750-51, 765 (E.D. Ky. 2019) (denying summary judgment to officer on excessive force claim where officer employed a chokehold "so quickly . . .there was arguably no time for any person to engage in any meaningful 'struggle."). For the reasons outlined above, Petry is entitled to summary judgment on Bruck's excessive force claims.

### 2. Failure to Intervene Claim Against Kermeen

Bruck contends that Kermeen is liable because she failed to intervene while Petry used excessive force against him. [Record No. 51, ¶ 41] To make a viable claim against an officer for failure to intervene, a plaintiff must prove that: (i) the officer observed or had reason to know that excessive force would be or was being used; and (ii) the officer had both the opportunity and the means to prevent the harm from occurring. *Smith v. City of Troy*, 874 F.3d 938, 945–46 (6th Cir. 2017) (citing *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997)). Here,

- 18 -

Kermeen argues that: (i) there was no use of excessive force; and (ii) Bruck cannot establish the elements of his claim. [Record No. 66-1, p. 28–29] She is correct regarding both assertions.

As an initial matter, Bruck lacks the prerequisite excessive force that must underlie his failure to intervene claim. And where there is no underlying excessive force, the defendant may not be liable for failure to intervene. *See Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 413 (6th Cir. 2015). In such a scenario, there is nothing to intervene against except the lawful actions of a peace officer fulfilling his duties. And as discussed above, Petry's uses of force were objectively reasonable. Therefore, Kermeen cannot be held liable for her failure to intervene. *See Bonner-Turner*, 627 F. App'x at 413.

But even if Petry's uses of force were constitutionally excessive, no reasonable juror could find that Bruck has met the elements of his failure to intervene claim. *See Smith*, 874 F.3d at 945–46. Regarding the takedown, Bruck and his family describe it as a sudden event, happening too fast for reaction. [Record No. 59, p. 42 (Bruck stating that he was "immediately tackled down."); Record No. 61, p. 37 (Bruck's mother testifying that the takedown happened so quickly she "ha[d] no idea what happened, how the officer grabbed him.")] Kermeen was standing near Bruck's mother when the takedown occurred and, like Bruck's mother, had no time to intervene and prevent the takedown before it happened. [Record No. 61, p. 36–39 (Bruck's mother describing the positioning of the parties at the time of the takedown); Record No. 64, p. 84–85 (Kermeen describing the same)]

And while Kermeen admits that she would have had the opportunity to intervene during the neck restraint encounter, Bruck has failed to show that she "observed or had reason to know" that the allegedly excessive force was being used. [Record No. 64, p. 96]; *Smith*, 874

F.3d at 945.  Kermeen testified that she never observed Petry's arm around Bruck's neck, and Bruck has not introduced any evidence to counter this assertion.  [Record No. 64, p. 92–93]  Kermeen did hear Bruck yelling that he couldn't breathe, but because he was screaming and continuing to fight the officers, she did not credit his assertion.  [*Id.*, p. 91–92]  Thus, Bruck's failure to establish both elements of his claim regarding either use of force shields Kermeen from liability as well.  *Smith*, 874 F.3d at 945–46.

Kermeen is also protected by qualified immunity.  *See Saucier*, 533 U.S. at 201.  Neither of the cases Bruck cites in his response clearly establish the right that he alleges Kermeen violated.  *See Smith*, 874 F.3d at 945–46 (affirming summary judgment on failure to intervene claim where officer was occupied trying to gain control of detainee's arms); *Turner*, 119 F.3d at 429–30 (reversing denial of qualified immunity on failure to intervene claim where officer had neither knowledge of blows nor opportunity to prevent them).

### B.   Federal Law Claims Against the MCSO

### 1.   Failure to Train and Failure to Supervise Claims

Bruck asserts claims under 42 U.S.C. § 1983 against the MCSO for alleged Fourth Amendment violations, arguing that the sheriff's office failed to adequately train and adequately supervise its law enforcement officers.[8]  [*See* Record No. 51, p. 6–7 (Count I of

---

[8]     While "[a] county sheriff's department is not a 'person' subject to suit under § 1983 because municipal departments are not suable under § 1983," courts construe such claims as being against the county itself.  *Gambrel v. Knox Cnty.*, No. 17-184-DLB, 2018 U.S. Dist. LEXIS 47898, at *8 n.7 (E.D. Ky. Mar. 23, 2018); *see also, e.g.*, *Lowe v. Ky. Ct. of Just.*, No. 2:14-cv-168-KKC, 2015 U.S. Dist. LEXIS 43527, at *3 (E.D. Ky. Apr. 2, 2015) (holding the Boone County Sheriff's Department and the Boone County Jail are "simply operating divisions of Boone County itself, not independent legal entities" and construing the claims as ones against Boone County directly); *Ford v. Batts*, No. 5:17-cv-94-TBR, 2018 U.S. Dist. LEXIS

Bruck's Amended Complaint).]  Government entities like the MCSO "cannot be liable under § 1983 on a *respondeat superior* theory."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Rather, to impose municipal liability for a constitutional violation, the violation must have been the result of a governmental "policy" or "custom."  *Id.* at 694–95.  *Monell* claims that survive the summary judgment stage are "exceedingly rare" and must "eclipse a high bar."  *Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521, 541–42 (6th Cir. 2108).

Here, Bruck's *Monell* claims fall short for several reasons.  Bruck has failed to plead the required elements of his claims.  [*See* Record No. 51 (Bruck's Amended Complaint).]  As stated above, a county is liable under § 1983 only when its official policy or custom causes the constitutional injury.  *Monell*, 436 U.S. at 694.  A plaintiff must identify the policy, connect the policy to the government entity, and show that the injury was incurred because of the execution of that policy.  *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005) (quoting *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003)).  And where a plaintiff fails to allege that a policy or custom existed, dismissal of the action is appropriate.  *See, e.g.*, *Alwine v. Unknown Hunky*, No. 1:20-cv-718, 2020 U.S. Dist. LEXIS 172006, at *7–8 (W.D. Mich. Sept. 21, 2020) (citing *Rayford v. City of Toledo*, No. 86-3260, 1987 U.S. App. LEXIS 1600, at *1 (6th Cir. Feb. 2, 1987)).

---

25024, at *3 (W.D. Ky. Feb. 15, 2018) (construing § 1983 claim against Ballard County Sheriff's Department as a claim against Ballard County).

Bruck's allegations do not identify any policy or custom of the MCSO.[9]  [*See* Record No. 51 (Bruck's Amended Complaint).]  The only pertinent factual allegation in his Amended Complaint is that "[t]he [MCSO] breached its duty to properly supervise and train its deputies on how to conduct welfare checks, interact with individuals with disabilities, and the proper use of force."[10]  [*Id.*, ¶ 30]  In other words, Bruck has completely failed to plead the facts required to state a viable *Monell* claim.  *See Turner*, 412 F.3d at 639 (discussing the facts that a plaintiff must plead).

Moreover, Bruck cannot prevail on this claim because he has failed to establish an underlying violation of his constitutional rights. "There can be no liability under *Monell* without an underlying constitutional violation."  *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) (citing *Scott v. Clay Cnty.*, 205 F.3d 867, 879 (6th Cir. 2000)).  As discussed above, neither Petry nor Kermeen violated Bruck's constitutional rights.  Because there is no

---

[9]      The MCSO noted this fact in its motion for summary judgment, arguing that Bruck failed to state a claim against it.  [Record No. 66-1, p. 30–31]  Bruck did not respond to the MCSO's argument on this point or otherwise address the pleading deficiency.  [*See* Record Nos. 72 & 72-1.]  Even if the substantive deficiency were not enough to doom Bruck's claim (although it is), his failure to respond is itself independent grounds to grant summary judgment.  *See Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

[10]      The *Monell* Court defined "policy" as "a policy statement, ordinance, regulation, or decision officially adopted and promulgated."  436 U.S. at 690. And it explained that a "custom" is a practice not authorized by written law but "so permanent and well settled as to constitute a 'custom or usage' with the force of law."  *Id.* at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)).  This allegation clearly does not meet either of these definitions.

constitutional violation, there is nothing to hold the MCSO liable for under *Monell*.  *See Robertson*, 753 F.3d at 622.

## 2.     Title II of the Americans with Disabilities Act Claim

Title II of the Americans with Disabilities Act ("ADA") provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity."  42 U.S.C. § 12132.  Two types of claims are cognizable under Title II—claims for intentional discrimination and claims for failure to make reasonable accommodation.  *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907 (6th Cir. 2004).

Bruck proceeds under a failure-to-accommodate theory.  [*See* Record No. 51, p. 7–8; Record No. 72-1, p.  22.]  He argues that MCSO had a duty to accommodate his mental health disabilities by "sending deputies that were trained and knowledgeable in interacting with persons with mental disabilities, that refrained from the excessive use of force and that utilized sufficient de-escalation efforts," and that it failed to do so.  [Record No. 72-1, p. 22]  The MCSO responds that deputies accommodated Bruck's disability, and that the further accommodations sought by Bruck are unreasonable in the arrest context.  [Record No. 75, p. 13–14]

Neither the Sixth Circuit nor the Supreme Court has decided whether Title II applies to arrests.  *See City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 610 (2015) (declining to decide whether the ADA applies to arrests); *Roell v. Hamilton Cnty.*, 870 F.3d 471, 489 (6th Cir. 2017) (same).  However, the Sixth Circuit has noted that, if Title II does apply, the

reasonable accommodation analysis must be informed by the exigent circumstances inherent in the arrest context. *Roell*, 870 F.3d at 489.

Viewing the facts in the light most favorable to Bruck, the undersigned concludes that he has failed to raise a genuine issue concerning his failure to accommodate claim. Regarding his first proposed accommodation, MCSO sent deputies "trained and knowledgeable in interacting with persons with mental disabilities." [Record No. 72-1, p. 22] Petry and Kermeen received training on how to interact with individuals with mental health issues, including how to recognize the signs or behavior associated with a mental disorder, how to handle welfare checks, and how to help de-escalate those in "the midst of a mental health crisis." [Record No. 63, p. 13, 111; Record No. 64, p. 27–28] Moreover, courts in the Sixth Circuit have rejected this type of "failure to train" ADA claim. *See, e.g.*, *Burton v. City of Memphis*, No. 2:13-cv-02070, 2013 U.S. Dist. LEXIS 146652, at *7 (W.D. Tenn. Oct. 10, 2013) (quoting *Scozzari v. City of Clare*, 723 F. Supp. 2d 974, 981 (E.D. Mich. 2010)) ("A plaintiff may not, however, pursue a 'failure to train' ADA claim arguing that law enforcement officials would have handled the arrest properly if they had been properly trained to 'handle individuals with mental health problems.'").

The MCSO fulfilled Bruck's next proposed accommodation as well. This proposal requested that the MCSO send deputies who "refain[] from the excessive use of force." [Record No. 72-1, p. 22] As discussed above, neither Petry nor Kermeen utilized constitutionally excessive force during their encounter with Bruck. Because the MCSO provided the requested accommodation, there has been no failure to accommodate.

- 24 -

The only remaining basis for Bruck's failure to accommodate claim is the assertion that deputies sent by the MCSO did not "utilize[] sufficient de-escalation efforts."  [Record No. 72-1, p. 22]  Bruck does not dispute that Petry and Kermeen attempted to de-escalate the situation by allowing Bruck's father to speak with him to attempt to calm him.  [*See* Record No. 59, p. 36, 40–41 (Bruck stating that his father came over to try to calm him down); Record No. 63, p. 109–10 (Petry stating that he allowed this in hopes it would serve to de-escalate the situation); Record No. 72-1, p. 22–23 (Bruck's response failing to contest the characterization that Petry and Kermeen did take steps to accommodate and de-escalate the situation).]  Instead, he takes issue with the sufficiency of those efforts.  [Record No. 72-1, p. 22]

But Petry and Kermeen faced a "series of quick, on-the-spot judgments in a continuously evolving environment."  *Roell*, 870 F.3d at 489.  And once they perceived a safety threat, they "need[ed] to take an action greater than de-escalation."  [Record No. 62, p. 57]  At that point, the proposed accommodation (*i.e.*, an undefined number of further de-escalation attempts) became "unreasonable . . . in light of the overriding public safety concerns."  *See Tucker v. Tennessee*, 539 F.3d 526, 536 (6th Cir. 2008); *Roell*, 870 F.3d at 489.

No reasonable jury could find that, by allowing Petry and Kermeen to respond to the call regarding Bruck's suicidal statements, the MCSO failed to accommodate his disabilities.

### C.    State Law Claims

#### 1.    Battery Claim Against Petry and Kermeen

Bruck relies on his excessive force arguments to assert a claim for battery under Kentucky law.  [Record No. 51, ¶ 48; Record No. 72-1, p. 19]  But Petry and Kermeen contend

that the uses of force were objectively reasonable and that they are shielded by qualified official immunity.  [Record No. 66-1, p. 35–36]

Where an officer's use of force is objectively reasonable for § 1983 purposes, a Kentucky law battery claim predicated on that use of force fails.  *Atwell v. Hart Cnty.*, 122 F. App'x 215, 219 (6th Cir. 2005) (citing *Fultz v. Whittaker*, 261 F. Supp. 2d 767, 783 (W.D. Ky. 2003)).  The Court has already determined that the uses of force here (both the takedown and the neck restraint) were objectively reasonable.  Accordingly, Bruck's battery claim based on those uses of force fails as a matter of law.  *See Atwell*, 122 F. App'x at 219.

Further, Petry and Kermeen are entitled to qualified official immunity on this claim. *See Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006).  Under Kentucky law, public officers or employees are entitled to qualified official immunity for negligent acts or omissions that were: (i) discretionary acts or functions; (ii) made in good faith (*i.e.*, not made in *bad faith*); and (iii) within the scope of the employee's authority.  *Id.*  Once the officer makes a *prima facie* showing that the act was discretionary and performed within the scope of their authority, the burden shifts to the plaintiff to demonstrate that the act was performed in bad faith.  *Yanero v. Davis*, 65 S.W.3d 510, 523 (Ky. 2001).  Bad faith can be based on a violation of a constitutional, statutory, or other clearly established right which a person in the officer's position should have known was afforded to the plaintiff, or if the officer willfully or maliciously intended to harm the plaintiff or acted with a "corrupt motive."  *Id.*

Here, Petry and Kermeen were acting within the scope of their employment when they reported to Bruck's residence.  It is also undisputed that law enforcement officers' decision regarding the appropriate amount of force required to detain an individual is discretionary.  *See*

*Smith v. Norton Hosps., Inc.*, 488 S.W.3d 23, 31 (Ky. App. 2016) (citing *Nichols v. Bourbon Cnty. Sheriff's Dep't*, 26 F. Supp. 3d 634, 642 (E.D. Ky. 2014)).  Arguing that the uses of force were performed in bad faith, Bruck relies on his contention that Petry and Kermeen violated his clearly established constitutional right to be free from the use of excessive force.  [Record No. 72-1, p. 20 ("Defendants concede that bad faith can be predicated on a violation of a clearly established constitutional right, such as the excessive force claims here, and therefore qualified official immunity does not apply.")]

This argument fails to carry Bruck's burden.  *See Yanero*, 65 S.W.3d at 523.  As discussed above, neither Petry nor Kermeen violated Bruck's constitutional rights.   And even if there was a constitutional violation, Bruck failed to prove that the right was "clearly established" at the time of the incident.  Accordingly, his argument purportedly demonstrating bad faith fails.  *See Yanero*, 65 S.W.3d at 523.  Petry and Kermeen are entitled to the protections of qualified official immunity and summary judgment on Bruck's state law battery claim. *See Sloas*, 201 S.W.3d at 475.

### 2.   Negligent Infliction of Emotional Distress Claim Against Petry and Kermeen

Petry and Kermeen argue that, because damages for emotional distress are available under Bruck's excessive force and battery claims, his claim for negligent infliction of emotional distress ("NIED") fails as a matter of law.  [Record No. 66-1, p. 37]  Bruck did not respond to this portion of the defendants' motion.  [*See* Record Nos. 72, 72-1.]  As a result, the Court assumes that he has abandoned these claims and does not oppose summary judgement in favor of Petry and Kermeen.  *See, e.g.*, *Brown*, 545 F. App'x at 372 ("[A] plaintiff

is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

Moreover, Petry and Kermeen's argument is well-taken. Where a plaintiff has redress for emotional damages through a traditional tort, he cannot bring an NIED claim unless the defendant's action was "intended only to cause extreme emotional distress."[11] *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. App. 1993). Here, damages for emotional distress are available under Bruck's § 1983 and battery claims. *Pembaur v. City of Cincinnati*, 882 F.2d 1101, 1104 (6th Cir. 1989) (citing *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986)). And Bruck does not allege that Petry and Kermeen's actions were intended only to cause emotional distress. [*See* Record Nos. 1, 72, 72-1.]

### 3. Negligent Hiring, Retention, Training, and Supervision Claims Against the MCSO

The MCSO contends that Bruck's state law claims for negligent hiring and retention and negligent training and supervision are barred by sovereign immunity. [Record No. 66-1, p. 37] Once again, Bruck did not respond to this portion of the defendants' motion. [*See* Record Nos. 72, 72-1.] Thus, the Court assumes that he does not oppose summary judgment in favor of the MCSO and has abandoned these claims. *See, e.g.*, *Brown*, 545 F. App'x at 372.

Further, the MCSO's position is substantively correct. It is well established that "a county government is cloaked with sovereign immunity." *Schwindel v. Meade Cnty.*, 113

---

[11]     Although this reasoning was originally applied to claims for *intentional* infliction of emotional distress ("IIED"), courts in this district have found it applicable to NIED claims as well. *See, e.g.*, *Horn v. City of Covington*, No. 14-73, 2015 U.S. Dist. LEXIS 85323, at *31–32 (E.D. Ky. July 1, 2015) (applying the same reasoning to both IIED and NIED claims and collecting cases where other courts have done the same).

S.W.3d 159, 163 (Ky. 2003).  This immunity extends to branches of the county government, such as county sheriff's offices and fiscal courts, as well as members of those institutions acting in their official capacity. *See Edmonson Cnty. v. French*, 394 S.W.3d 410, 414 (Ky. App. 2013).  The MCSO is a branch of the Madison County government. Thus, Bruck's state law claims for negligent hiring, retention, training, and supervision are barred by sovereign immunity.

IV.

After careful review, and based on the foregoing analysis and discussion, it is hereby

**ORDERED** that the Defendants' motion for summary judgment [Record No. 66] is **GRANTED**.

Dated: June 10, 2022.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky